### SAN ANTONIO TRACTION CO. v. ROBERTS.

(Court of Civil Appeals of Texas. San Antonio. Nov. 27, 1912. Rehearing Denied Jan. 8, 1913.)

1. APPEAL AND ERROR (§ 1064*)—REVIEW—ASSUMED FACTS.

In an action for injuries to a passenger in a collision between street cars, a charge assuming that the collision was caused by the carrier's negligence, in the absence of any evidence explaining the cause of the collision, is harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4219, 4221–4224; Dec. Dig. § 1064.*]

2. STREET RAILROADS (§ 114*)—INJURIES TO PASSENGERS — STREET RAILROADS — COLLISION.

In an action for injuries to a passenger in a street railroad collision, evidence *held* to warrant a finding that the collision was of sufficient violence to cause the injury complained of, and that such injuries were the direct and proximate result thereof.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 239–250; Dec. Dig. § 114.*]

3. DAMAGES (§ 132*)—EXCESSIVENESS—PERSONAL INJURIES.

Plaintiff's wife, who was 45 years old, was injured in a street railway collision. She suffered a displaced kidney and womb, a spinal shock, and afterwards had an abnormal heartbeat and adhesions in the pelvic cavity. These afflictions were permanent, caused pain, and incapacitated her from every kind of work. It was shown that they could only have resulted from inflammation due to infection, in which case there would have been a condition of chronic invalidism, or from accident. There was evidence that prior to the collision the wife was a strong, healthy woman doing considerable work and had an earning capacity of some $35 to $60 a month. *Held*, that a verdict allowing $10,000, was not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 178, 372–385, 396; Dec. Dig. § 132.*]

4. APPEAL AND ERROR (§§ 930, 1031*)—PRESUMPTIONS — INSTRUCTIONS FOLLOWED — PREJUDICE.

Where, on objection to a question asked of counsel during argument, the court immediately instructed the jury not to consider the same, and the counsel who asked the question also joined in such request, it must be presumed that the instructions were obeyed and that the question was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3755–3761, 4038–4046; Dec. Dig. §§ 930, 1031.*]

Appeal from District Court, Bexar County; Claude V. Birkhead, Judge.

Action by J. H. Roberts against the San Antonio Traction Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Templeton, Brooks, Napier & Ogden, of San Antonio, for appellant. Bertrand, Arnold & Carl, of San Antonio, for appellee.

MOURSUND, J., This is a suit for damages, instituted by appellee, on account of injuries alleged to have been sustained by his wife by reason of a collision between two of appellant's cars, upon one of which she was a passenger, which collision was charged to have been caused by the negligence of appellant company. Verdict was returned in favor of appellee for $10,000, and judgment entered accordingly.

The first two assignments of error attack the court's charge, on the theory that it assumes the defendant was guilty of negligence. The paragraph complained of reads as follows: "If you believe from the evidence that on or about January 21, 1911, Mrs. J. H. Roberts was the wife of the plaintiff, and was a passenger of defendant on one of defendant's street cars, and that said street car came in collision with another street car of defendant, and if you further believe from the evidence that such collision, if you find there was a collision, was directly and proximately caused by the negligence of the defendant, and that such negligence, if any, was the direct and proximate cause of Mrs. J. H. Roberts receiving, if she did, any of the injuries alleged, then you are instructed to find your verdict for the plaintiff."

[1] It is unnecessary to pass upon the question whether the above charge was technically erroneous, because, where a collision is shown to have occurred between two of

appellant's cars, and absolutely no evidence is introduced which explains the cause of such collision, a charge assuming that the same was caused by negligence is harmless. Railway v. Day, 50 Tex. Civ. App. 407, 111 S. W. 663; Railway v. Lauricella, 87 Tex. 277, 28 S. W. 277, 47 Am. St. Rep. 103; Railway v. Fales, 33 Tex. Civ. App. 457, 77 S. W. 234; S. A. Traction Co. v. Probandt, 125 S. W. 932; Railway Co. v. Gracia, 45 Tex. Civ. App. 229, 100 S. W. 198; Railway v. Lindsey, 51 Tex. Civ. App. 69, 110 S. W. 995; Railway Co. v. Harkey, 39 Tex. Civ. App. 524, 88 S. W. 506; Southern Pac. Co. v. Blake, 128 S. W. 669.

[2] Assignments 3, 4, 5, 6, 7, and 8 are submitted together. The contentions are: (1) That the evidence was not sufficient to show that the collision was of sufficient violence to have caused the injuries complained of; (2) that there was not sufficient evidence to show that the injuries to Mrs. Roberts were the direct and proximate result of the collision.

At the time of the collision Mrs. Roberts was sitting in the corner of a South Heights car on the small seat facing towards the center of the car. Mrs. Procanow was sitting on the same seat. Mrs. Roberts' body was touching both the side and end of the car. The other car struck right against the corner in which she was sitting. Miss Cowles and Mrs. Roberts' daughter were sitting on the first cross-seat next to the seat occupied by Mrs. Roberts. Miss Cowles testified the car on which they were riding was going fast at the time of the collision. Some of the witnesses testified the cars came together with a terrible crash. Others described it as a severe crash. They said the cars were still locked together when they left. Mrs. Roberts, in describing the effect the collision had upon her, said: "When the crash came, I was falling, pitching right out in front, and I caught to save myself. I must have caught on the seat and pushed myself back, the seat or the wall, caught at something to push myself back. I kept myself from falling on the floor. I was going right out on my head." Miss Cowles was thrown to the floor. She said when she got up Mrs. Roberts was sitting on the seat; that Mrs. Roberts was not thrown out, but was thrown over to the side.

Mrs. Procanow testified that, if Mrs. Roberts went forward or to the side, she did not know it; that she had her four year old boy in her lap at the time, and he slipped off down into the aisle; that she fell forward; that she could not state positively how she fell, but knew that she and the child went forward; that she stood up and was so weak in the knees that she leaned right back and sat down in the seat, and set the child in her lap and tried to calm him; that the child was screaming so the people all crowded around her and asked if he was hurt.

Miss Roberts testified she was thrown against the window and her arm was bruised, but it was not hurt very bad; that it was sore for four or five days; that she noticed her mother falling, but that she caught with her hands; that the cars were wedged together, and the fender of the car was bent and mashed up. From these facts we conclude the collision was of sufficient force to injure Mrs. Roberts, and that the extent of the injury would depend largely upon the position of her body at the time of the sudden blow. In looking to the evidence to see what injuries were inflicted upon her, we find that immediately after the collision, and before leaving the car, her back pained her and she complained of her injury. Feeling unable to stand up, she went into a drug store, procured an opiate, and sat there a while. Then she and Mrs. Procanow walked down the street looking for her daughter and Miss Cowles, but, feeling dizzy, she went into Dreiss' drug store, but Mr. Dreiss refused to give any medicine, not knowing what she had already taken. She kept feeling worse, but was persuaded by the young ladies to go to a moving picture show, at which she stayed until it was over, though she testified she protested against staying, but was persuaded by her daughter. When they got home she did not tell her husband about the occurrence, but had Miss Cowles and her daughter to rub her with turpentine. They found bruises and marks upon her back.

Mrs. Roberts' testimony, in part, is as follows: "I was in extreme pain. My head was aching, and I was nauseated. I was helped from the car home. When I got home, I had a bottle of turpentine, and the girls rubbed me, rubbed my back. Miss Cowles and my daughter were in the room with me. I kept getting worse instead of better, but didn't want to disturb anybody to go get a doctor for me, and I finally thought I would try to wait until morning; but I saw I was getting so much worse, and at 3 o'clock I called my son to go for a physician. Still I thought I was very nervous from this shock and wanted a physician to come and give me something, and that I would feel all right, and the physician came and gave me a hypodermic. The physician was Dr. Davis, who lived on Porter street a couple of blocks from where we lived. He was the nearest and only physician in that part of town. Dr. Davis came again at 11 o'clock, but at 6 or before, as soon as it was light, the girls went to rub my back with liniment and found it was bruised. Dr. Davis came two or three times that day. I didn't rest at all. That is why I had the doctor back there, to give me something. Dr. Davis treated me two weeks. The third day after the accident Dr. Parker came to see me. I had known him several years before that, known him at Cotulla, Tex. Dr. Parker came

to see me the third day after I was hurt, but I am not quite clear at this moment just what was the occasion of his coming. He came and examined me. On the sixth or seventh day after the accident, Dr. Caffery came. At that time I had not gotten up because I was not able to. Dr. Caffery examined me, and probably two weeks after that he came to see me again, and I was taken to the hospital. Went to the hospital that day. This was the Baylor Hospital. Dr. Caffery treated me at the Baylor Hospital, and I remained there three weeks. After that three weeks I took treatment from the doctor at his office. I saw him twice a week because I couldn't get down oftener than that. I was in bed almost the entire time. He applied local treatment. From that time on I have never at any time been out from the doctor's treatment since the accident."

Dr. Caffery testified that when he examined Mrs. Roberts he found evidence of bruises and contusions over the small of her back, especially in the right side, running down over the right hip; that her abdomen was tense and swollen; that he made a vaginal examination for the purpose of determining the trouble; that she was so sensitive that a satisfactory examination was impossible; that all he could determine was that there was some serious condition present, but he did not feel justified in punishing her with a complete examination at the time.

After she left the hospital she visited Dr. Caffery's office every week to receive treatment, and Dr. Caffery testified that he found after a few weeks she was growing worse, caused by the jolting of the buggy bringing her to town and the effort in walking and getting about.

[3] Her afflictions were described in detail by four physicians. She was suffering from displaced kidney, displaced womb, a spinal shock, abnormal heartbeat, and the formation of a mass of adhesions. The various organs in her pelvic cavity adhered to each other and to the walls of the cavity, with the result that whenever she took a step or moved it caused a strain or tension to be placed upon the adhesions and caused her pain. These afflictions are permanent and cause a great deal of pain and discomfort, as well as incapacitating her from any kind of work. It is true these injuries were very severe and could be determined by the physicians without being based upon anything told them by Mrs. Roberts, but they suggest the inquiry whether all this could be caused by the blow of the collision. The evidence of many witnesses was to the effect that prior to the collision Mrs. Roberts was a strong healthy woman, doing her own housework, and in addition soliciting insurance for the Woodmen Circle, and at one time being engaged in running a large boarding house. Dr. Caffery testified there were only two possible causes which could lead to the condition she was in; that one cause was infection, which would result in inflammation, and the other cause was violence of some kind, such as an accident; that, if her condition was due to infection, her condition prior to his examination of her would have been one of chronic invalidism. He also stated that at the time he made his first examination he did not believe her condition was a chronic condition, but a recent trouble. He also testified that a displaced kidney can be caused from a sudden movement of the body which would throw the contents of the pelvic cavity suddenly forward and then have the body suddenly arrested. Dr. J. D. Bell testified that displacement of the kidney will come usually from a jolt or jar, or fall, or something of that kind; that adhesions are caused by inflammation; and that, when the womb is adherent in an abnormal position, something must have occurred to shove it over into such improper position.

We conclude that there is sufficient evidence to sustain the finding that injuries from which Mrs. Roberts is suffering were proximately caused by the collision in question.

Assignments 9 and 10 complain of the verdict being excessive. We do not think so. According to the evidence, she will be an invalid the balance of her life and suffer much pain. Her condition has been fully described in discussing the preceding assignments. It appears that prior to the collision she had an earning capacity of from $35 to $60 per month, and that she was 45 years old.

[4] The eleventh assignment complains of a question propounded by counsel for appellee during the closing argument made by one of appellant's counsel. It appears from the bill of exceptions that appellant's counsel, after arguing at considerable length that there was no evidence of any other passengers being injured by the collision in question, asked counsel for appellee the question, "Why did you not show some one else was injured in that wreck, if there was such a crash?" Thereupon counsel for appellee asked counsel for appellant the following question: "Is it not a fact that two other persons were injured in the same collision, and that the company has settled with them, and that the records of your company will show this?" Counsel for appellant replied that he did not know. Upon objection to the question asked by appellee's counsel the same was withdrawn by such counsel and the court instructed the jury not to consider the same.

Appellee seeks to justify this question by claiming that counsel for appellant was misstating the evidence, that the same showed an injury to the arm of Miss Roberts, that one of the others complained, and that another was thrown to the floor with some violence. Admitting this, still it certainly would not justify appellee's counsel in going out of the record in the manner he did. He

had ample opportunity in the closing argument to point out such evidence, or, if it would have afforded more satisfaction, could, at the time, have stated the evidence upon which he relied to show injuries to other persons. When asked for a reason for not showing that some one else was injured in the collision, counsel, if satisfied with the evidence along that line, could have said they had proved it. We strongly disapprove of any statements or questions which have a tendency to give one party to a suit an unfair advantage, but it is not our right or province to reverse a case unless there is something in the record indicating that such statement or question was considered by the jury to the other party's prejudice. The question, after being answered, "I don't know," was objected to, whereupon the court immediately instructed the jury not to consider the same, and counsel who asked the question also made the same request. The jury is presumed to obey the instructions of the court, and, unless there is something in the record to rebut the presumption, the case should not be reversed.

We do not find that the verdict is against the preponderance of the evidence in any matter which could have been affected by the question. There can be no question of appellant's liability for such injuries as Mrs. Roberts suffered by reason of the collision, nor does the preponderance of the evidence favor the contention that the injuries complained of by her were not proximately caused by the collision. The verdict is not so large as to indicate passion or prejudice. We find nothing in the record indicating that the jury disregarded the instructions of the court, and therefore overruled the assignment. Brown v. Perez, 89 Tex. 282, 34 S. W. 725; Railway v. Aleman, 52 Tex. Civ. App. 565, 115 S. W. 73; Freeman v. McElroy, 126 S. W. 659; McLane v. Paschal, 74 Tex. 20, 11 S. W. 839; Railway Co. v. Martin, 49 Tex. Civ. App. 197, 108 S. W. 983; Life Ins. Co. v. Wagner, 50 Tex. Civ. App. 233, 109 S. W. 1125; West v. Oil Co., 56 Tex. Civ. App. 341, 120 S. W. 234.

As we find no error requiring the reversal of the judgment, the same is affirmed.